UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DAMON M. LOPEZ,<br><br>                    Plaintiff,<br><br>v.<br><br>CORIZON, INC.; DR. ELIASON; and<br>MS. SEYS,<br><br>                    Defendants. | Case No. 1:15-cv-00123-EJL-CWD<br><br>**ORDER AND<br>REPORT AND RECOMMENDATION** |

**INTRODUCTION**

Pending before the Court is Defendants' motion for summary judgment, and Plaintiff's motion to compel. (Dkt. 17, 20.) Having reviewed the parties' briefing, as well as the record in this matter, the Court concludes oral argument is unnecessary. Dist. Idaho L. Rule 7.1. Accordingly, the Court enters the following order denying Plaintiff's motion to compel, and recommending the motion for summary judgment be granted and the complaint against Defendants be dismissed with prejudice.

# FACTS[1]

Plaintiff is a prisoner in the custody of the Idaho Department of Correction (IDOC), currently incarcerated at the Idaho State Correctional Institution. Plaintiff alleges that Corizon, Inc. ("Corizon"), the private entity providing medical treatment to Idaho state prisoners under contract with the IDOC, as well as two individual medical providers, violated his Eighth Amendment right to adequate prison medical care. Plaintiff claims also that Defendants violated state law.

According to Plaintiff, prior to his incarceration, he at times took the medication Wellbutrin to treat his mental health issues. This medication worked very well for Plaintiff, but he claims Corizon does not allow this drug to be prescribed to any prisoner. (Compl., Dkt. 3, at 2.) Plaintiff alleges Defendants Eliason and Seys have prescribed more than six other medications to Plaintiff in an attempt to treat him, but that all of these drugs "had very bad side-effects or did not work." (*Id.*) The Court in its initial review order found Plaintiff's claims against Defendants plausible under the Eighth Amendment.

Dr. Eliason is employed by Corizon, LLC, as the Regional Psychiatric Director for Idaho. He is Board Certified in both general psychiatry and forensic psychiatry, and he has six years of experience in correctional psychiatry. Dr. Eliason explains in his affidavit that Corizon's formulary list is a list of medications that do not require approval before they can be prescribed by the on-site providers. Although Wellbutrin is not on Corizon's formulary list, that does not mean it cannot be prescribed. Corizon does not prevent

---

[1] The facts contained in this section are undisputed unless otherwise indicated. When the facts are disputed, they are taken in the light most favorable to McCabe, the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (recognizing the district court's obligation to construe the record in the light most favorable to the nonmoving party on motion for summary judgment).

**ORDER and REPORT AND RECOMMENDATION  - 2**

medical providers from prescribing Wellbutrin or any other non-formulary drug when it is medically indicated. Further, to Dr. Eliason's knowledge, Corizon does not have any policy prohibiting medical providers from prescribing medications that are not on the formulary list.

Dr. Eliason states that the process for prescribing a non-formulary medication requires the on-site provider to submit a request to Dr. Eliason for approval that explains the need for the drug and why an alternative drug on the formulary list cannot be used. Based on that information, Dr. Eliason either approves the request, sends the request back with an alternative treatment plan, or gathers more information. There is no evidence in the record that a prison medical provider ever submitted a non-formulary drug request to Dr. Eliason for Wellbutrin for Plaintiff.

Dr. Eliason explains also that cost is not a factor determining a drug's placement on the formulary list. Wellbutrin is a very inexpensive medication but, according to Dr. Eliason, it is not listed on the formulary because it is highly abused by inmates in prisons and jails across the country. Dr. Eliason explained he is aware of the risks of Wellbutrin abuse in the prison setting, and therefore the standard of care is to not prescribe Wellbutrin if there is an effective alternative, because the risks of misuse and abuse outweigh the benefits when there are effective alternatives. In Plaintiff's case, Dr. Eliason indicated Wellbutrin was contraindicated for use because Plaintiff had a documented history of substance abuse.

According to the medical records and Dr. Eliason's testimony contained within his affidavit, he examined Plaintiff once, on July 26, 2010. (Dkt. 20-5 at 2.) At that time,

Plaintiff reported to Dr. Eliason a long history of polysubstance abuse, including alcohol, marijuana, and methamphetamine abuse. He reported also a history of depression and anxiety. Dr. Eliason recorded that Plaintiff had been on multiple medications, usually for a very short period of time due to side effects or poor compliance. Plaintiff reported he had previously taken Wellbutrin, amitriptyline, Remeron, and trazodone. Plaintiff reported also that he was attending recreation and playing volleyball or horseshoes. Plaintiff reported his appetite was good and he denied suicidal thoughts. Dr. Eliason noted that Plaintiff's hygiene was good, and his thoughts linear and logical. Plaintiff was not delusional, and his speech was normal. According to Dr. Eliason, Plaintiff's mood was good and he was joking with Dr. Eliason in the hallway prior to the interview.

Based on the patient's subjective reports and Dr. Eliason's objective observations, Dr. Eliason determined Plaintiff did not meet the criteria for anxiety or depression at that time. In Dr. Eliason's opinion, Plaintiff was experiencing normal levels of anxiety and depressed mood with incarceration, but he was compensating well and his activities of daily living were unaffected. Dr. Eliason did not plan to provide Plaintiff any medications at that time because of Dr. Eliason's determination Plaintiff could adequately function without them.

The medical evidence of record indicates Jane Seys, a Psychiatric Nurse Practitioner employed by Corizon, provided continuing psychiatric care and pharmacotherapy management to Plaintiff. Seys is able to write prescriptions as a Psychiatric Nurse Practitioner. According to Seys, she was never told she was prohibited from prescribing Wellbutrin, and knows of no Corizon policy preventing it from being

ORDER and REPORT AND RECOMMENDATION  - 4

prescribed so long as advance approval is secured, and the drug is medically indicated. In Seys's opinion, at the time she treated Plaintiff, she did not believe Wellbutrin was medically indicated for treatment of Plaintiff's depression, because other medications had been effective and Plaintiff reported being able to perform all activities of daily living with minimal negative side effects from other prescribed medications.

Seys met with Plaintiff approximately every two to three months beginning in October of 2012. Dr. Eliason's review of the medical records indicated Plaintiff never reported feeling suicidal or homicidal while on other medications and that, although he sometimes felt sad or lethargic, Plaintiff continued to report participation in sports and other physical activities as well as prison employment.

Upon review by the Court, the treatment records indicate the following self-reports by Plaintiff over the course of his mental health treatment while in prison.[2]

### Self Reports

On October 29, 2012, Plaintiff met with Seys and reported that he was "not good." (Dkt. 20-5 at 20.) His appetite was alright but he reported feeling apathetic and with no energy. Plaintiff stated also he could not be positive and he felt hopeless. Plaintiff was currently taking Celexa, and Seys changed his medication to 40 mg Prozac.

On December 3, 2012, Plaintiff met with Seys and reported that his medication may be "doing something," but his energy level was not that great and he was not sleeping well. (Dkt. 20-5 at 22.) However, Plaintiff stated also that his appetite was good

---

[2] Plaintiff's medical records include visits with Karen Barrett, MS, beginning in October of 2010, and continuing regularly throughout 2011 and 2012. (Dkt. 20-5 at 4 – 20.) The records indicate Plaintiff requested Wellbutrin, but that Barrett assessed Plaintiff as stable and functional on his other medications. Barrett was not named as a defendant, however.

**ORDER and REPORT AND RECOMMENDATION  - 5**

and he was playing basketball. Although Plaintiff reported symptoms of anxiety (heart racing and not sleeping well), Seys documented Plaintiff was laughing and appeared to be doing well, with his affect within normal limits. Seys increased Prozac to 60 mg.

On February 11, 2013, Plaintiff met with Seys and reported he was doing better and was sleeping, getting exercise, and eating well. (Dkt. 20-5 at 23.) Plaintiff reported he had no complaints and was playing basketball and planned to play softball and soccer, and continue working building furniture. Plaintiff was taking 60 mg Prozac. Seys determined that Plaintiff was stable on his medication and planned to continue it.

On May 6, 2013, Plaintiff met with Seys and reported that he had "hit the level point" or "flat-lined." (Dkt. 20-5 at 24.) Plaintiff reported he was not great but not down, and was sleeping a lot, especially on weekends. Plaintiff reported his mood was good and he had no problem with appetite. He was still playing soccer and softball, and working building furniture, and he reported that his energy level was adequate or good "because I make it good." Plaintiff was still taking 60 mg Prozac. Seys determined that the patient was stable on his current medication and planned to continue it.

On August 1, 2013, Plaintiff met with Seys and stated that he felt lethargic or flat again. (Dkt. 20-5 at 25.) Plaintiff reported skipping pill call or breakfast sometimes, but once he is up he is fine because he goes to work. Plaintiff stated that his appetite was good, he did not feel sad, and he was sleeping at night, but that sometimes he had to force himself to do anything. Seys determined switching to another medication might be beneficial due to reports of lethargy. Accordingly, Seys's notes indicate she planned to discontinue Prozac and start Zoloft.

**ORDER and REPORT AND RECOMMENDATION - 6**

On September 12, 2013, Plaintiff met with Seys and stated that he felt lethargic and drowsy, and that he was sleeping all weekend. (Dkt. 20-5 at 27.) However, Plaintiff reported he was not feeling sad and was trying to keep a positive attitude. Plaintiff reported the Zoloft improved his mood but made him lethargic. Plaintiff was still working building furniture. Seys planned to switch from Zoloft to Effexor due to Plaintiff's reported lethargy with Zoloft.

On October 10, 2013, Plaintiff with Seys and reported feeling a little better, although he was very constipated. (Dkt. 20-5 at 30.) Plaintiff reported feeling pretty good most days and that was working a lot and had more energy. Plaintiff indicated he was sleeping at night and his appetite was good. At that time, Plaintiff was taking 75 mg Effexor. Seys documented that the patient reported feeling better but had a little residual depression. She planned to increase his Effexor to 150 mg.

On January 2, 2014, Plaintiff met with Seys and reported doing "alright." (Dkt. 20-5 at 31.) Plaintiff stated his blood pressure went up a little bit, that his mood was good six out of seven days, and that he felt the medication was working, but he was constipated. Plaintiff reported work was going well, he was getting exercise, and his appetite and sleep were good. Seys planned to continue the Effexor.

On February 26, 2014, Plaintiff met with a mental health clinician (J. Menlove, LPC) to update his assessment and treatment plan. (Dkt. 20-5 at 34.) Plaintiff reported he was doing well and denied current mental health symptoms or concerns. Plaintiff stated he was satisfied with his current medication and denied a need for increased support.

On March 27, 2014, Plaintiff met with Seys and stated that he was doing "alright." (Dkt. 20-5 at 36.) Plaintiff reported a good appetite, and that he was sleeping and his energy was "alright." Plaintiff had no complaints about the way he felt, and that he was exercising and continuing to work building furniture. Seys planned to continue the 150 mg Effexor because Plaintiff reported doing well and that he wished to continue it.

On June 19, 2014, Plaintiff met with Seys and reported his medication's effectiveness was fading but he did not want to increase the dosage. (Dkt. 20-5 at 40.) Plaintiff complained of chronic constipation, which he reported was worse with Effexor. Plaintiff requested to try something else for his depression. However, Plaintiff reported his energy was good, he played sports for exercise, his appetite was good, and he was building furniture at work. Seys planned to switch from Effexor to Lexapro, at the patient's request.

On August 14, 2014, Plaintiff met with Seys and reported he had no motivation. (Dkt. 20-5 at 46.) Plaintiff reported sleeping all day and night, and specifically requested to be on Wellbutrin. Seys advised she could not prescribe Wellbutrin, but Seys's notes do not indicate why. Although Plaintiff stated he had no energy, he also reported he was exercising by running, playing soccer, and working out at the gym. He also reported that his appetite was good. Seys planned to switch from Lexapro to Prozac because of the patient's reported decreased energy with Lexapro.

On October 1, 2014, Plaintiff again met with Seys and stated he still wanted Wellbutrin and that it was cruel and unusual punishment not to get it. (Dkt. 20-5 at 48.) Although Plaintiff reported a lack of motivation, he reported feeling "not as tired and

lethargic from Prozac." Plaintiff's appetite was within normal limits and he was trying to force himself to exercise. Plaintiff reported no sleep problems and stated that he was working and building furniture. Seys planned to increase the dosage of Prozac.

On November 24, 2014, Plaintiff met with Seys and reported Prozac did not work. (Dkt. 20-5 at 51.) Plaintiff reported he slept the whole weekend although he got up to go to a basketball game. Plaintiff further stated that Effexor "kind of worked" but it gave him constipation and his blood pressure went up a little bit. He had no sleep complaints and stated that he was still working and getting exercise. He refused to attend mental health classes. Seys noted Plaintiff continued to report depressive symptoms, but he would not attend mental health classes and continually wanted to change medications. Seys's notes indicated she explained the constant medication changes were not a good idea, but she agreed to discontinue Prozac and go back to Effexor because Plaintiff reported it had been the most helpful.

Plaintiff began submitting complaints his antidepressants were making him constipated. (Dkt. 20-5 at 52 - 56.) Plaintiff was instructed to increase water intake. Chart notes indicated Plaintiff declined laxatives and stool softeners (Dkt. 20-5 at 54) and was told that medications could be changed if constipation continued.

On February 5, 2015, Plaintiff had an assessment with a mental health clinician (K. Sligar, LCSW). (Dkt. 20-5 at 59 - 61.) Plaintiff reported no mental health symptoms and confirmed good medication compliance. Plaintiff expressed he had good coping skills and that, along with his medication regime, he was managing his mental health

quite well. The clinician recommended that the patient continue to manage his mental health stability with his medication regime and coping skills.

On March 16, 2015, Plaintiff met with Seys and reported he was "about the same." (Dkt. 20-5 at 63.) However, Plaintiff reported work was going well, his appetite was good, and he had no issues with sleep. Plaintiff reported also that his energy was good, and he as working out, playing basketball and soccer, and building furniture at work. He was currently taking 100 mg Effexor and denied side effects. Seys planned to increase Plaintiff's dosage to 150 mg Effexor.

On June 25, 2015, Plaintiff saw Seys and requested to increase his medications because they were being crushed and he believed they were less effective. (Dkt. 20-5 at 70.) Plaintiff again stated he wanted Wellbutrin. However, Plaintiff reported he was playing soccer and softball and had energy. Plaintiff reported he got a lot of exercise, his appetite was good, and he was sleeping. Plaintiff stated also that things were going well at work and overall he was doing well. Seys agreed to increase the patient's Effexor dosage to 225 mg.

On September 17, 2015, Plaintiff was seen by Seys and stated he was feeling alright but was quick to anger. (Dkt. 20-5 at 71.) Plaintiff wondered if his anger was a side effect of Effexor. Plaintiff reported playing basketball and softball and that he was very active in sports. However, Plaintiff stated his fingers were cold after playing and he felt it was from the Effexor. Seys reportedly asked Plaintiff why he never reported this condition previously, and Plaintiff had no answer. Plaintiff reported his medication was working but he did not like the side effects. Plaintiff stated he was working in the kitchen

**ORDER and REPORT AND RECOMMENDATION  - 10**

and had gained weight as a result. Seys documented that the patient was alert and oriented and his speech was clear, his thoughts were coherent and goal oriented, and his mood was within normal limits. Seys noted Plaintiff was now reporting side effects from Effexor that he never reported before. Plaintiff stated the only medication that worked was Wellbutrin, but Seys indicated in her assessment notes that Wellbutrin created a risk in the prison setting. Seys planned to decrease and then discontinue Effexor and start Pamelor.

On October 8, 2015, Plaintiff stopped Seys in the hallway to report withdrawal symptoms (dizziness, lightheadedness) from stopping Effexor. (Dkt. 20-5 at 72.) Seys explained that Effexor had been weaned slowly, and advised Plaintiff to drink plenty of water. Plaintiff stated he was not having any problems with his new medication, although he wanted an increased dose. Plaintiff reported he was no longer constipated. Seys documented Plaintiff was smiling and interacting with others before, during, and after their encounter, and that Plaintiff denied thoughts of self-harm or harm to others.

On October 15, 2015, Plaintiff saw Seys for an office visit. (Dkt. 20-5 at 73.) Plaintiff reported his withdrawal symptoms went away, although he was experiencing dry mouth and cold hands and feet. Plaintiff reported that, other than anxiety and sleeping too much, he was doing fine, playing soccer, working in the kitchen, and that he felt the Pamelor was worth pursuing. Seys observed Plaintiff's thoughts were coherent and goal oriented, that his attitude was cooperative, and that his mood was within normal limits. Seys planned to increase the dosage of Pamelor.

**ORDER and REPORT AND RECOMMENDATION  - 11**

According to Seys, she would consider prescribing Wellbutrin if a patient were experiencing severe symptoms to the extent that he was no longer able to participate normally in activities of daily living and other medications were ineffective. (Seys Aff. ¶ 5).

## DISPOSITION

### 1.  Motion to Compel[3]

Federal Rule of Civil Procedure 26(b) allows parties to obtain discovery "regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to information, the parties' resources, the importance of the discovery resolving the issues, and whether the burden or expense of the propounded discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable." Fed. R. Civ. P. 26(b)(1).

"On motion or on its own, the court must limit the frequency or extent of discovery otherwise allowed by these rules or by local rule if it determines that … the proposed discovery is outside the scope permitted by Rule 26(b)(1)." Fed. R. Civ. P. 26(b)(2)(C)(iii).

Evidence is relevant if it has "any tendency to make a fact more or less probable than it would be without the evidence; and the fact is of consequence in determining the

---

[3] The Federal Rules of Civil Procedure, particularly the rules regarding discovery, were amended effective December 1, 2015. Although Defendants filed their motion prior to the effective date of the amendments, the Court cites the rules in effect as of December 1, 2015, as the amended rules now govern this matter.

**ORDER and REPORT AND RECOMMENDATION  - 12**

action." Fed. R. Evid. 401. However, district courts are given broad discretion to apply

discovery rules to properly effect the policy of the Federal Rules of Civil Procedure,

namely, the rules "should be construed, administered, and employed by the court and the

parties to secure the just, speedy, and inexpensive determination of every action and

proceeding." Fed. R. Civ. P. 1.

If the answering party fails to adequately respond to discovery requests or fails to

make a disclosure required by Fed. R. Civ. P. 26(a), the propounding party can move for

an order compelling discovery under Fed. R. Civ. P. 37(a). Generally, a court should

deny a motion to compel only if the information requested falls outside the scope of

discovery. *See Nugget Hydroelectric, L.P. v. Pacific Gas & Elec. Co.*, 981 F.2d 429, 438-

39 (9th Cir. 1992); *cert. denied*, 508 U.S. 908 (1993). In other words, a motion to compel

"should be granted if questions are relevant and proper…." Charles A. Wright, Arthur R.

Miller & Richard L. Marcus, FEDERAL PRACTICE AND PROCEDURE § 2286

(1994).

In his motion to compel, Plaintiff represents he asked for the following documents

in his requests for production: (1) a complete copy of his medical and mental health file;

(2) copies of all c-notes which contain the name of Plaintiff; (3) copies of all concern

forms or grievances by Plaintiff; (4) a copy of Corizon's formulary which is used to

dispense medications at ISCI; and (5) a complete copy of all incidents of abuse for the

drug Wellbutrin at ISCI. Plaintiff generally argues that he seeks information about his

complete medical file and grievances so he can make changes and amend the complaint.

Plaintiff propounded also requests for admissions, indicating he asked for Defendants to admit the following: (1) that other inmates are prescribed Wellbutrin at ISCI. And finally, Plaintiff represents his set of interrogatories asked for information about (1) the name of the psychiatrist who personally met with him and denied the use of Wellbutrin; and (2) the standard criteria for someone to be diagnosed with anxiety or depression.

Defendants represent they served their Initial Disclosures pursuant to this Court's order providing Plaintiff's medical records including Psychiatric Progress Notes, Interdisciplinary Progress Notes, Physicians' Orders Sheets, Clinical Contact Notes, Medication Administration Records, Medication Non-Adherence Notes, and Plaintiff's Health Services Requests from July 2010 to current. The medical records contain the opinions, diagnoses, observations, assessments, and treatment plans of medical staff who have examined and treated Plaintiff, including Dr. Eliason and Ms. Seys. Consequently, Defendants objected to Plaintiff's requests for production on the grounds of relevance, arguing they provided the medical records relevant to Plaintiff's Eighth Amendment Claim centering upon the refusal to prescribe him Wellbutrin upon Plaintiff's request.

The Court will deny Plaintiff's motion to compel. Upon review of the record, it appears Defendants have produced all relevant medical records relating to Plaintiff's alleged Eighth Amendment claim. Further, Plaintiff has been able to fully respond to Defendant's motion for summary judgment and did not show by affidavit or declaration that he could not present facts essential to justify his opposition to the same without the requested discovery. Fed. R. Civ. P. 56(d). The failure to do so fatally undermines

Plaintiff's claim that the requested discovery is relevant to his claims in this matter. And finally, the deadline to amend pleadings to add new claims or parties is long past. Plaintiff's attempt to cast a wider net during a "fishing expedition" is not permitted under the rules of discovery. *See, e.g., United States v. Dade*, No. 4:09-cv-512-BLW, 4:01-cr-BLW, 2010 WL 4907850, at *2 (D. Idaho Dec. 2, 2010) (unpublished) ("Discovery is not to be used for 'fishing expeditions to investigate mere speculation' or for a prisoner to 'explore [his] case in search of its existence.'") (quotation omitted).

Plaintiff now contends none of the drugs he was prescribed worked for him, and his mood was not stabilized. He contends that, upon his arrival at ISCI, he was removed from the drug Wellbutrin, which worked for him in the past. Plaintiff disputes that his medical records indicate he maintained his activities of daily living, because sometimes, the records indicated he was unmotivated to continue his exercise routine. Plaintiff argues that, simply because he reports engaging in activity during his periodic visits with Seys, the records do not indicate he was actually doing those activities as he reported. And finally, Plaintiff disputes Dr. Eliason's statement that Wellbutrin is abused in the prison system.[4]

## 2.   Motion for Summary Judgment

### A.   *Standard of Law for Summary Judgment*

Summary judgment is appropriate where a party can show that, as to any claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). One of the principal purposes of the

---

[4] Plaintiff has not provided any evidence other than his arguments and contradictory statements.

**ORDER and REPORT AND RECOMMENDATION - 15**

summary judgment "is to isolate and dispose of factually unsupported claims ...." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). It is "not a disfavored procedural shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id*. at 327.

"[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247–48 (1986). The requirement is that there be no genuine dispute as to any material fact. "Material facts are those that may affect the outcome of the case." See id. at 248. The moving party is entitled to summary judgment if that party shows that each material issue of fact cannot be disputed. To show that the material facts are not in dispute, a party may cite to particular parts of materials in the record, or show that the materials cited do not establish the presence of a genuine dispute, or that the adverse party is unable to produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(A) & (B); *see T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (citing *Celotex*, 477 U.S. at 322). The Court must consider "the cited materials," but it may also consider "other materials in the record." Fed. R. Civ. P. 56(c) (3).

Material used to support or dispute a fact must be "presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c) (2). Affidavits or declarations submitted in support of or in opposition to a motion "must be made on personal knowledge, set out

**ORDER and REPORT AND RECOMMENDATION - 16**

facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

The Court does not determine the credibility of affiants or weigh the evidence set forth by the non-moving party. The evidence of the opposing party is to be believed, *Anderson*, 477 U.S. at 255, and all reasonable inferences which can be drawn from the evidence must be drawn in a light most favorable to the nonmoving party. *T.W. Elec. Serv.*, 809 F.2d at 630–31 (internal citation omitted). If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue (dispute) as to any material fact actually does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

The existence of a scintilla of evidence in support of the non-moving party's position is insufficient. Rather, "there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252. Rule 56(e)(3) authorizes the Court to grant summary judgment for the moving party "if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(3).

## B. *Section 1983 Claims*

Plaintiff brings his claims under 42 U.S.C. § 1983, the civil rights statute. To state a claim under § 1983, Plaintiff must establish the existence of four elements: "(1) a violation of rights protected by the Constitution or created by federal statute (2) proximately caused (3) by conduct of a 'person' (4) acting under color of state law." *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991). Section 1983 is "'not itself a

source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Graham v. Connor*, 490 U.S. 386, 393–94 (1989) (quoting *Baker v. McCollan,* 443 U.S. 137, 144 n.3 (1979)).

"Liability under section 1983 arises only upon a showing of personal participation by the defendant." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) (citation omitted). In other words, Plaintiff must show that Defendants' actions caused the deprivation of a constitutional right. 42 U.S.C. § 1983; *Arnold v. International Business Machines Corp*., 637 F.2d 1350, 1355 (9th Cir. 1981). "The causation requirement of § 1983 ... is not satisfied by a showing of mere causation in fact[;][r]ather, the plaintiff must establish proximate or legal causation." *Id*. The United States Court of Appeals for the Ninth Circuit has explained: "A person 'subjects' another to the deprivation of a constitutional right, within the meaning of § 1983, if he does an affirmative act, participates in another's affirmative acts, or omits to perform an act which he is legally required to do that causes the deprivations of which he complains." *Id*. (internal citation omitted).

To bring a § 1983 claim against a municipality (local governmental entity) or a private entity performing a government function, a plaintiff must allege that the execution of an official policy or unofficial custom inflicted the injury of which the plaintiff complains, as required by *Monell v. Department of Social Services of New York*, 436 U.S. 658, 694 (1978). *See also Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1139 (9th Cir. 2012) (applying *Monell* to private entities). Under *Monell*, the requisite elements of a § 1983 claim against a municipality or private entity performing a state function are the following: (1) the plaintiff was deprived of a constitutional right; (2) the municipality or

ORDER and REPORT AND RECOMMENDATION  - 18

entity had a policy or custom; (3) the policy or custom amounted to deliberate indifference to plaintiff's constitutional right; and (4) the policy or custom was the moving force behind the constitutional violation. *Mabe v. San Bernardino Cnty.*, 237 F.3d 1101, 1110-11 (9th Cir. 2001).

An unwritten policy or custom must be so "persistent and widespread" that it constitutes a "permanent and well settled" practice. *Monell*, 436 U.S. at 691 (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167-168 (1970)). "Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996). Further, a municipality or private entity performing a state function "may be held liable under § 1983 when the individual who committed the constitutional tort was an official with final policy-making authority or such an official ratified a subordinate's unconstitutional decision or action and the basis for it." *Clouthier v. County of Contra Costa*, 591 F.3d 1232, 1250 (9th Cir. 2010).

## C.   *Eighth Amendment Claims of Inadequate Medical Care*

The Eighth Amendment to the United States Constitution protects prisoners against cruel and unusual punishment. The Eighth Amendment includes the right to adequate medical care and mental health care in prison. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *Doty v. County of Lassen*, 37 F.3d 540, 546 (9th Cir. 1994). To state a claim under the Eighth Amendment, Plaintiff must show that he is incarcerated "under conditions posing a substantial risk of serious harm," or that he has been deprived of "the

ORDER and REPORT AND RECOMMENDATION  - 19

minimal civilized measure of life's necessities." *Farmer v. Brennan*, 511 U.S. 825, 834

(1994) (internal citation omitted). An Eighth Amendment claim requires a plaintiff to

satisfy "both an objective standard—that the deprivation was serious enough to constitute

cruel and unusual punishment—and a subjective standard—deliberate indifference."

*Snow v. McDaniel*, 681 F.3d 978, 985 (9th Cir. 2012).

Regarding the objective standard for prisoners' medical care claims, the Supreme

Court of the United States has explained that "[b]ecause society does not expect that

prisoners will have unqualified access to health care, deliberate indifference to medical

needs amounts to an Eighth Amendment violation only if those needs are 'serious.'"

*Hudson v. McMillian*, 503 U.S. 1, 9 (1992).

The Ninth Circuit has defined a "serious medical need" in the following ways:

> [F]ailure to treat a prisoner's condition [that] could result in further
> significant injury or the unnecessary and wanton infliction of pain [;] ...
> [t]he existence of an injury that a reasonable doctor or patient would find
> important and worthy of comment or treatment; the presence of a medical
> condition that significantly affects an individual's daily activities; or the
> existence of chronic and substantial pain ....

*McGuckin v. Smith*, 974 F.2d 1050, 1059–60 (9th Cir. 1992) (internal citations omitted),

*overruled on other grounds, WMX Techs., Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997)

(en banc).

As to the subjective standard, a prison official acts with "deliberate indifference ...

only if the [prison official] knows of and disregards an excessive risk to inmate health

and safety." *Gibson v. Cnty. of Washoe, Nev*., 290 F.3d 1175, 1187 (9th Cir. 2002)

(citation and internal quotation marks omitted). "Under this standard, the prison official

**ORDER and REPORT AND RECOMMENDATION  - 20**

must not only 'be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists,' but that person 'must also draw the inference.'" *Toguchi v. Chung*, 391 F.3d 1051, 1057 (9th Cir. 2004) (quoting *Farmer*, 511 U.S. at 837). "If a [prison official] should have been aware of the risk, but was not, then the [official] has not violated the Eighth Amendment, no matter how severe the risk." *Gibson*, 290 F.3d at 1188 (citation omitted). Nonetheless, "whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, ... and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842; *see also Lolli v. County of Orange*, 351 F.3d 410, 421 (9th Cir. 2003) (deliberate indifference to medical needs may be shown by circumstantial evidence when the facts are sufficient to demonstrate that defendant actually knew of a risk of harm).

Differences in judgment between an inmate and prison medical personnel regarding appropriate medical diagnosis and treatment are not enough to establish a deliberate indifference claim. *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989). "[T]o prevail on a claim involving choices between alternative courses of treatment, a prisoner must show that the chosen course of treatment 'was medically unacceptable under the circumstances,' and was chosen 'in conscious disregard of an excessive risk' to the prisoner's health." *Toguchi*, 391 F.3d at 1058 (alteration omitted) (quoting *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996)).

Mere indifference, medical malpractice, or negligence will not support a cause of action under the Eighth Amendment. *Broughton v. Cutter Labs*., 622 F.2d 458, 460 (9th Cir. 1980) (per curiam). Nor does the Eighth Amendment provide a right to a specific treatment. *See Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997) ("[The plaintiff] is not entitled to demand specific care. She is not entitled to the best care possible. She is entitled to reasonable measures to meet a substantial risk of serious harm to her."). Finally, a mere delay in treatment does not constitute a violation of the Eighth Amendment unless the delay causes further harm. *McGuckin*, 974 F.2d at 1060.

### 3.   Analysis

#### A.   *Corizon*

Corizon, a corporation, may be held liable only if a policy or custom of the entity causes the alleged deprivation of constitutional rights. Plaintiff argues Corizon's policy is decline to prescribe effective drugs for an inmate's serious medical condition if the drug is not on the formulary. However, Plaintiff has not come forward with evidence of any policy other than his opinion based upon his requests for Wellbutrin, and the resulting denial of a prescription for Wellbutrin. But, the undisputed facts in the record indicate Corizon maintained a formulary list of approved medications, and would prescribe a medication not on the formulary list if the inmate's medical condition warranted it.

In the instant case, Corizon's Regional Psychiatric Director, Dr. Eliason, explained in his affidavit Wellbutrin was abused within the prison system and was contraindicated in mental health patients with a history of polysubstance abuse, like Plaintiff. Although Dr. Eliason did not provide medical journals or other independent support for his

ORDER and REPORT AND RECOMMENDATION  - 22

statement that Wellbutrin is subject to abuse, the Court located numerous reports that the antidepressant is considered the "poor man's cocaine," because when injected or snorted, the drug gives users a "crack-like high at a much cheaper price." Jennifer Tryon, *Antidepressant Wellbutrin Becomes 'Poor Man's Cocaine' On Toronto Streets,* Global News, Sept. 18, 2013;[5] Angela Mulholland, *Doctors Warn Of Potentially Fatal Abuse Of Wellbutrin Antidepressant*, CTV news, July 25, 2013.[6]

Based upon the lack of disputed facts or any evidence of a Corizon custom or policy that caused any injury to Plaintiff, the Court will recommend summary judgment be granted to Corizon on Plaintiff's Eighth Amendment Claim.

### B.   *Dr. Eliason and Jane Seys*

Plaintiff contends Dr. Eliason and Ms. Seys were deliberately indifferent to his serous medical needs because he was prescribed numerous medications to treat his depression that were not effective, and was unjustifiably denied a prescription for Wellbutrin despite the fact that it alleviated his depression symptoms in the past.

However, the records indicate Plaintiff was evaluated regularly, initially by Dr. Eliason and then on an ongoing basis by Seys, who performed an individual assessment of Plaintiff's mental health condition and the effectiveness of the current medication regimen. Plaintiff's self-reports of his mood, activity level, appetite, and general wellbeing to Seys indicated Plaintiff was not suicidal, he was appropriately engaged in prison life, and he generally reported feeling good while taking Effexor, Pamelor, and

---

[5] http://globalnews.ca/news/846576/antidepressant-wellbutrin-becomes-poor-mans-cocaine-on-toronto-streets/
[6] http://www.ctvnews.ca/health/health-headlines/doctors-warn-of-potentially-fatal-abuse-of-wellbutrin-antidepressant-1.1383282

Prozac. When he reported the drugs began lacking effectiveness, Seys changed his medication. The evidence establishes Plaintiff's medications were working adequately to control his depressed mood.

Based upon the medical evidence of record, there is more than sufficient evidence Seys and Dr. Eliason were treating Plaintiff in a sufficient and medically acceptable manner. Seys's treatment plan was to monitor Plaintiff on his current medication, increase the dose to maximum therapeutic effectiveness, and when Plaintiff reported unpleasant side effects or that the drug was no longer controlling his mood, to try a different medication. Plaintiff's disagreement with this treatment plan and desire for a prescription of Wellbutrin is just that---a disagreement, which is not actionable under Section 1983. *See Sanchez*, 891 F.2d at 242. The burden thus shifts to Plaintiff to raise a genuine issue that the treatment plan was "medically unacceptable under the circumstances" or was "chosen in conscious disregard of an excessive risk" to Plaintiff's mental health. *Toguchi*, 391 F.3d at 1058 (internal quotation marks omitted).

Here, Plaintiff has not met his burden to create a genuine issue of material fact that the treatment plan chosen by Seys was "medically unacceptable" or chosen in conscious disregard of an excessive risk to Plaintiff's mental health. At no time did Plaintiff report feeling suicidal---only lethargic, sad, or suffering from unwanted side effects such as constipation. The record establishes when Plaintiff reported changes in his mood or undesirable side effects, Seys and other medical personnel responded, either by recommending remedies to eliminate the side effects (like suggesting suppositories for his constipation), or by changing his mood stabilizing drugs.

**ORDER and REPORT AND RECOMMENDATION  - 24**

Moreover, Plaintiff's attempt to contraindicate the facts by stating he reported positively to Seys about his activity level, but that he was not actually engaging in them, would require Seys and Dr. Eliason to be clairvoyant. The Eighth Amendment is violated only if a prison official "should have been aware of the risk, but was not." *Gibson*, 290 F.3d at 1188 (citation omitted). Plaintiff has not shown that Seys and Dr. Eliason had any subjective knowledge other than what Plaintiff reported to them during office visits to discuss his progress and his mood. Accordingly, the Court will recommend summary judgment be granted.

## CONCLUSION

Plaintiff has not met his burden upon summary judgment with regard to his Eighth Amendment claims of deliberate indifference to his serious medical needs. Summary judgment should therefore be granted to Defendants. Further, the Court lacks jurisdiction over any state law claims alleged in Plaintiff's complaint upon dismissal of Plaintiff's constitutional claims.

## <u>ORDER</u>

**NOW THEREFORE IT IS HEREBY ORDERED:**

1)      Plaintiff's Motion to Compel (Dkt. 17) is **DENIED**.

Dated: **May 24, 2016**

Honorable Candy W. Dale
United States Magistrate Judge

## <u>RECOMMENDATION</u>

**NOW THEREFORE IT IS HEREBY RECOMMENDED:**

1)      Defendants' Motion for Summary Judgment (Dkt. 20) be **GRANTED**.

Written objections to this Report and Recommendation must be filed within fourteen (14) days pursuant to 28 U.S.C. § 636(b)(1) and Dist. Idaho L. Rule 72.1(b), or as a result of failing to do so, that party may waive the right to raise factual and/or legal objections to the United States Court of Appeals for the Ninth Circuit.

Dated: **May 24, 2016**

Honorable Candy W. Dale
United States Magistrate Judge

**ORDER and REPORT AND RECOMMENDATION  - 26**